IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BENJAMIN BISHOP, | Civ. No. 16-00248 JMS-KSC |
| Plaintiff, | ORDER GRANTING |
| vs. | DEFENDANT'S MOTION TO DISMISS, ECF NO. 26 |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, ECF NO. 26

## I.  INTRODUCTION

Plaintiff Benjamin Bishop ("Plaintiff" or "Bishop") alleges that fellow-inmate Michael Tanouye ("Tanouye") attacked and beat him in his cell at the Honolulu Federal Detention Center ("FDC") soon after Tanouye was admitted to the FDC.  Plaintiff's First Amended Complaint ("FAC"), filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"), claims that Defendant United States of America ("Defendant" or "the government") negligently screened Tanouye during his admission, improperly placing a dangerous or suicidal inmate with Plaintiff and causing Plaintiff's injuries.  ECF No. 26.

The government moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss the FAC, arguing that Plaintiff's claims are barred by 28 U.S.C. § 2680(a), the discretionary function exception to the FTCA.[1]  Based on the following, Defendant's Motion is GRANTED.

## II. <u>BACKGROUND</u>

### A.    Factual Background

Plaintiff filed the November 21, 2016 FAC, ECF No. 24, pursuant to leave granted by this court after the court dismissed the original complaint.  ECF No. 23.  Addressing an FTCA pleading requirement, the FAC added detailed jurisdictional allegations regarding Bureau of Prisons ("BOP") policies or regulations which Plaintiff contends create mandatory, non-discretionary, duties as necessary to invoke the FTCA.  *See, e.g.*, *Prescott v. United States*, 973 F.2d 696, 701 (9th Cir. 1992) ("Only after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by § 2680 does the burden fall on the government to prove the applicability of a specific provision of  § 2680.") (citation omitted).

---

[1]  The government moves, in the alternative, under Rule 12(b)(6) to dismiss Plaintiff's claim that is based on suicide-prevention duties, arguing that harm to Plaintiff was not foreseeable because such policies are meant to protect the suicidal inmate, and not third-parties such as Plaintiff.  Because the court grants the Motion based on the discretionary function exception, it need not reach this alternative argument.

To that end, the FAC alleges the following relevant facts, which the court generally assumes as true for purposes of a motion to dismiss (except where such factual allegations are specifically challenged in a motion attacking subject-matter jurisdiction). *See, e.g.*, *Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014) (reiterating in a discretionary-function exemption context that courts "generally accept as true the factual allegations of Plaintiffs' complaint"); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("In resolving a factual attack on jurisdiction [under Rule 12(b)(1)] . . . [t]he court need not presume the truthfulness of the plaintiff's allegations.") (citations omitted).

### 1.     *Tanouye is Arrested and Placed in Bishop's Cell*

On October 12, 2014, Bishop was an inmate at the FDC.  FAC ¶ 10, ECF No. 24.[2]  Allegedly, "[t]hat evening[,] a new prisoner, [a] very stocky and strong 29-year old man, Michael Tanouye, was brought into Mr. Bishop's cell and Mr. Bishop was told to watch this prisoner as the prisoner was on suicide watch." *Id*. ¶ 11.[3]  Bishop did not know that Tanouye "was having serious mental problems and had attempted to rape a woman on an airplane flight to Japan."  *Id*. ¶ 12.  "FBI

---

[2]  According to the BOP's inmate locator, Plaintiff is currently incarcerated at the Federal Correctional Institution in Allenwood, Pennsylvania.  *See* https://www.bop.gov/inmateloc (last accessed April 5, 2017).

[3]  As explained below, Plaintiff now concedes (after conducting discovery into the issue) that Tanouye was, in fact, not on suicide watch when placed in Plaintiff's cell.

agents [had] arrested Michael Tanouye for interfering with a flight crew and aggravated sexual assault aboard an aircraft." *Id*. ¶ 14.

While en route to Japan, Tanouye "forced his way into a bathroom and sexually assaulted a woman, according to an FBI affidavit." *Id*. ¶ 15. "Flight attendants and passengers told the FBI that a male passenger was injured while struggling to subdue Tanouye." *Id*. ¶ 21. Prior to that, "Tanouye was heard shouting something incomprehensible and his mother told a flight attendant that he suffers from depression and is on medication." *Id*. ¶ 22. "After the incident, Tanouye's mother gave him a dose of his psychiatric medicine and he fell asleep." *Id*. ¶ 24.

The airplane returned to Honolulu after the caption heard that it took three passengers to keep Tanouye calm. *Id*. ¶ 25. "Hawaii sheriff deputies took Mr. Tanouye off the plane when it landed in Honolulu and FBI agents arrested him and brought him to the FDC, where he was held pending arraignment." *Id*. ¶ 26. According to the FAC, "both the sheriff's department and FBI were on notice that Mr. Tanouye was seriously dangerous and deranged." *Id.* ¶ 27. A Public Health Service psychiatrist later explained to Bishop that Tanouye "was a paranoid schizophrenic." *Id*. ¶ 60.

## 2. **BOP "Program Statements"**

The FAC identifies two sets of BOP "program statements" that Plaintiff alleges set forth relevant mandatory duties regarding (1) intake screening of newly-admitted inmates; and (2) psychiatric and/or medical screening, and suicide prevention.[4]

### a. *The "Intake-Screening" Program Statement*

First, the FAC emphasizes portions of BOP Program Statement P5290.15, regarding "Intake Screening." *Id.* ¶ 30 ("Statement P5290.15"). Statement P5290.15 is based on 28 C.F.R. § 522.21, which provides:

> (a) Except for such camps and other satellite facilities where segregating a newly arrived inmate in detention is not feasible, the Warden *shall* ensure that a newly arrived inmate is cleared by the Medical Department and provided a social interview by staff *before* assignment to the general population.
>
> (1) Immediately upon an inmate's arrival, staff *shall* interview the inmate to determine if there are non-medical reasons for housing the inmate away from the general population. Staff *shall* evaluate both the general physical appearance and emotional condition of the inmate.
>
> (2) Within 24 hours after an inmate's arrival, medical staff *shall* medically screen the inmate in compliance with Bureau of Prisons' medical procedures

---

[4] "[A] BOP program statement is 'an interpretative statement of position circulated within [the] agency that serves to provide administrative guidance in applying a then existing published rule.'" *Cook v. Wiley*, 208 F.3d 1314, 1317 (11th Cir. 2000) (quoting *Pelissero v. Thompson,* 170 F.3d 442, 447 (4th Cir. 1999)).

to determine if there are medical reasons for housing the inmate away from the general population or for restricting temporary work assignments.

(3) Staff *shall* place recorded results of the intake medical screening and the social interview in the inmate's central file.

*Id.* (emphases added).  These regulatory provisions of § 522.21 are included within Statement P5290.15.

In accordance with that regulation, Statement P5290.15 provides that "before placing [an] inmate in the institution's general population, staff shall ensure that health, safety, and security standards delineated in this Program Statement are met.  Social and medical screening interviews are required to meet these standards."  Statement P5290.15 ¶ 1, ECF No. 29-2.  It has as its stated objective that "[s]ocial and medical screening interviews will be conducted on all inmates prior to their placement in general population."  *Id.* ¶ 3.

Statement P5290.15 includes several potentially applicable provisions. Among these are:

Staff shall observe the physical appearance of the inmate and interview each inmate prior to placement in general population.

If this is not possible, inmates are to be kept in detention until completion of the medical clearance and social interview.  Each institution shall develop procedures for processing commitments after regular working hours.

At camps and other satellite facilities, segregating a newly arrived inmate in detention is often not feasible; however, the Warden shall ensure that the inmate is cleared by the Health Services Department and provided a social interview by staff consistent with the requirements of this Program Statement.

*Id.* ¶ 7.

The social interview is to be conducted in private (no other inmates in area) by a Unit Manager, Correctional Counselor, Case Manager, or other staff the Warden designates who have been trained in intake screening. The interviewer conducting the social interview must have completed successfully the CIM Certification Program prior to conducting the interview.

- The interviewer shall also review SENTRY information and the Inmate Central File or Presentence Investigation Report (PSI), if available, and make a decision whether the inmate is suitable for placement in general population.

During the social intake screening process, the interviewer shall review the PSI and the Inmate Central File for any documentation indicating the inmate has a history of sexually aggressive behavior or has recently been the victim of a sexual assault.

- In such cases, the interviewer shall immediately forward a copy of the Intake Screening Form and any other comments to Psychology Services for appropriate follow-up and or assessment.

. . . .

The intake screening procedures identified in this Program Statement may be modified at the Warden's discretion for pretrial short-term (less than 48 hours) inmates and court returns.

- Ordinarily, modified intake screening procedures would only be appropriate at Metropolitan Correctional Centers, Metropolitan Detention Centers or other institutions with a primary mission of providing pretrial confinement.

Staff shall place particular emphasis on the Central Inmate Monitoring status of the holdover, since, ordinarily, an inmate may not be transported with or confined with inmates from whom he or she is to be separated.

To ensure that separatees are not housed together, staff shall access the newly received inmate's SENTRY-generated Intake Screening form and thoroughly review the CIM Clearance and Separatee Data to identify any separatees currently housed in the institution. Staff may also cross-check the names of separates with an alphabetical list of all inmates in the institution.

*Id.*

    b.    *Psychiatric Screening and Suicide Prevention Program Statements*

The FAC also sets forth intake-related provisions in two other program statements -- Program Statement P6340.01, entitled "Psychiatric Services" ("Statement P6340.1") and Program Statement P5324.08, entitled "Suicide Prevention Program" ("Statement P5324.08"). In particular, paragraph 9a of Statement P6340.1 has a section regarding "Intake Screening" that provides:

a. **Intake Screening.** Staff performing intake screening will assess and make appropriate referrals to a mental health professional when an inmate:

- Has a mental health designation;
- Exhibits signs or symptoms consistent with a possible mental disorder; or
- Is on medication for treatment of a mental illness or disorder.

Screening will be of sufficient detail to determine appropriate housing for the inmate until a thorough mental health evaluation can be completed.

FAC ¶ 31, ECF No. 24. And Statement P5324.08 includes the following provisions as part of a suicide prevention policy:

### 9. IDENTIFICATION OF AT-RISK INMATES.

a. **Medical Staff Screening.** Medical staff are to screen a newly admitted inmate for signs that the inmate is at risk for suicide. Ordinarily, this screening is to take place within twenty-four hours of the inmate's admission to the institution.

- The Physician's Assistant/Nurse Practitioner (PA/NP) will refer suicidal or emotionally disturbed inmates on an emergency basis to the Program Coordinator or designee.

. . . .

11. **INTERVENTION.** Upon completion of the suicide risk assessment, the Program Coordinator or designee will determine the appropriate intervention that best meets the needs of the inmate. Because deliberate self-injurious behavior does not necessarily reflect suicidal intent, a variety of interventions other than placing an inmate on suicide watch may be deemed appropriate by the Program Coordinator, such as heightened staff or inmate interaction, a room/cell change, greater observation, placement in restraints, or referral for psychotropic medication. In any case, the Program Coordinator or designee will assume

responsibility for the recommended intervention and clearly document the rationale.

. . . .

    b.  **Suicidal Inmates.**  If the Program Coordinator determines the individual to have an imminent potential for suicide, the inmate will be placed on suicide watch in the institution's designated suicide prevention room.  The actions and findings of the Program Coordinator will be documented, with copies going to the central file, medical record, psychology file, and the Warden.

## 12.  SUICIDE WATCH.

    a.  **Housing.**  Each institution must have one or more rooms designated specifically for housing an inmate on suicide watch.  The designated room must allow staff to maintain adequate control of the inmate without compromising the ability to observe and protect the inmate.

- The primary concern in designating a room for suicide watch must be the ability to observe, protect, and maintain adequate control of the inmate.

- The room must permit easy access, privacy, and unobstructed vision of the inmate at all times.

. . . .

Inmates on watch will be placed in the institution's designated suicide prevention room, a non-administrative detention/segregation cell ordinarily located in the health services area.  Despite the cell's location, the inmate will not be admitted as an in-patient unless there are medical indications that would necessitate immediate hospitalization.

. . . .

    c.  **Observation.**  For **all** suicide watches:

- Any visual observation techniques used to monitor the suicide companion program will focus on the inmate companion and/or the inmate on suicide watch only.

- The observer and the suicidal inmate will not be in the same room/cell and will have a locked door between them.

1) **Staff Observers.** The suicide watch may be conducted using staff observers. Staff assigned to a suicide watch must have received training (Introduction to Correctional Techniques or in AT) and must review and sign the Post Orders before starting the watch. The Program Coordinator will review the Post Orders annually to ensure their accuracy.

2) **Inmate Observers.** Only the Warden may authorize the use of inmate observers (inmate companion program). The authorization for the use of inmate companions is to be made by the Warden on a case-by-case basis. If the Warden authorizes a companion program, the Program Coordinator will be responsible for the selection, training, assignment, and removal of individual companions. Inmates selected as companions are considered to be on an institution work assignment when they are on their scheduled shift and shall receive performance pay for time spent monitoring a potentially suicidal inmate.

Statement P5324.08 ¶¶ 9, 11-12, ECF No. 29-4.

c. *Alleged Violations of Intake-related Duties*

The FAC alleges that FDC personnel failed to complete "non-discretionary intake directives in regards to Mr. Tanouye['s] intake at FDC." FAC ¶ 33. In particular, "[i]n [filling] out the 'Intake Screening Form' upon Mr.

Tanouye's arrival at the FDC . . . FDC employee Jimmie White Jr. did not ask or inquire into whether Mr. Tanouye had a history of sexually aggressive behavior." *Id.* ¶ 34. "This is clear as the space for the answer to this question on the Intake Screening Form is left blank." *Id.* ¶ 35. "This is a clear violation of the non-discretionary mandates of Program Statement Number P5290.15 as evidenced on the Intake Screening Form." *Id.* ¶ 36. "Mr. White also did not review Mr. Tanuoye's PSI or Central File." *Id.* ¶ 37. Mr. White also wrote "New Commit" on the intake form in an allegedly "nonresponsive" answer to the question: "If general physical appearance is not good, explain." *Id.* ¶ 38. And the FAC alleges that "Mr. White simply asked a psychotic Tanouye: 'Do you know of any reason you should not be placed in general population?,'" to which Tanouye answered "No." *Id.* ¶ 39.

The FAC further alleges that because "the personnel at the FDC knew or should have known that Mr. Tanouye was suicidal, had been on psychiatric medication and had violently tried to rape a woman on a flight to Japan, Mr. Tanouye should have never been put into a cell with Mr. Bishop." *Id.* ¶ 61. Specifically, "[i]f Mr. Tanouye's intake screening had been done according to the non-discretionary regulations[,] the FDC staff would have known that Mr. Tanouye was unfit to be housed with the general population as he had a very recent history of sexual aggression and was a paranoid schizophrenic on psychiatric

medication." *Id.* ¶ 64. More specifically, the FAC alleges that the "negligent violation of this non-discretionary policy regarding suicidal inmates resulted in Mr. Tanouye being placed with Mr. Bishop when Mr. Tanouye should have been isolated in the FDC's designated suicide prevention room." *Id.* ¶ 67.

### 3. *Plaintiff is Injured*

According to the FAC, "[o]n the morning of Monday[,] October 13, 2014, Mr. Bishop awoke as normal to find himself in his cell with Mr. Tanouye sleeping." *Id.* ¶ 40. Soon after that, Tanouye, "a man much heavier" than Bishop, woke up and "threw Mr. Bishop to the ground and began to viciously beat Mr. Bishop about the head." *Id.* ¶ 41. "Mr. Bishop struggled to get to the panic button in the cell, but could not reach it because of Mr. Tanouye's strength and aggression." *Id.* ¶ 42. After beating Bishop for some time, Tanouye "told Mr. Bishop he would stop beating him if Mr. Bishop would not touch the panic button." *Id.* ¶ 43. "Mr. Bishop agreed and Mr. Tanouye eventually stopped beating Mr. Bishop." *Id.* ¶ 44. When Bishop asked Tanouye why he beat him, Tanouye responded that he thought Bishop "was the devil." *Id.* ¶ 45. Bishop was taken to Queen's Medical Center, where he was treated for his injuries. *Id.* ¶¶ 50-52. Bishop "suffered multiple contusions, his left eye was completely swollen shut, he experienced numbness to the left side of his face, multiple lacerations and

bruising to his face." *Id*. ¶ 62. The FAC alleges that Bishop's injuries were caused by negligence of BOP officials in improperly screening Tanouye.

"In sum, the FDC personnel negligently failed to discharge a nondiscretionary duty to perform intake screening or intake screening that met the non-discretionary directives of the aforementioned Program Statements to identify Mr. Tanouye as an inmate that clearly should not have been put into the general population of the FDC or in a cell with Mr. Bishop." *Id.* ¶ 71.

## B. Procedural Background

Plaintiff originally filed this FTCA action on May 19, 2016, after exhausting administrative remedies as necessary under 28 U.S.C. § 2675. ECF No. 1. On July 29, 2016, the government filed a motion to dismiss and/or for summary judgment that raised the discretionary function exemption under 28 U.S.C. § 2680(a). ECF No. 10. In addressing that motion, the court determined that the FDC's ultimate decision as to Tanouye's placement, even if it was negligent, necessarily would fall within the discretionary-function exception. ECF No. 23 at 10 (citing *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) (concluding that decisions about classifying inmates or assigning them to a particular unit or institution fall within discretionary-function exception); *Rich v. United States*, 811 F.3d 140, 145-46 (4th Cir. 2015) (holding that "[p]rison

officials are afforded discretion in determining where to place inmates and whether to keep certain individuals . . . separated from one another") (citations omitted)).

Plaintiff, however, had raised (without pleading) BOP regulations that he claimed set forth mandatory intake duties that were not followed -- and if such regulations were applicable, and if they were in fact not followed, then the FDC might not have been in a position actually to exercise its discretion in placing Tanouye. *See, e.g.*, *Usry v. United States*, 2013 WL 1196650, at *7 (N.D. W. Va. Mar. 25, 2013) ("*[S]o long as BOP personnel followed guidelines* in classifying inmates and placing them in certain institutions, the ultimate decision regarding an inmate's placement was discretionary.") (citing *Cohen v. United States*, 151 F.3d 1338, 1343 (11th Cir. 1998) (emphasis added)), *aff'd* 545 F. App'x 265 (4th Cir. Nov. 6, 2013) (mem.). But because Plaintiff had failed to plead any facts regarding the discretionary function exemption, the court granted the motion, and dismissed the Complaint with leave to amend. ECF No. 23; *see, e.g.*, *United States v. Gaubert*, 499 U.S. 315, 324-25 (1991) ("For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."). Accordingly, Plaintiff filed the FAC on November 21, 2016. ECF No. 24.

On December 12, 2016, the government filed the present Motion to Dismiss under Rule 12(b)(1), again raising the FTCA's discretionary function exception. ECF No. 26. The government also argues under Rule 12(b)(6) that, as to suicide-prevention regulations, any harm to Plaintiff was not a foreseeable result of any violation of such regulations, which are meant to protect the suicidal inmate and not to protect others. Plaintiff filed his Opposition on February 6, 2017, ECF No. 29, and Defendant filed a Reply on February 13, 2017. ECF No. 30. The court held a hearing on the Motion on February 27, 2017.

Based on discussions at that February 27, 2017 hearing, the court held the matter in abeyance, and gave Plaintiff (with cooperation from government counsel) the opportunity to conduct limited discovery into one key issue -- whether Tanouye was actually on "suicide watch" when he was admitted to FDC and placed in Plaintiff's cell (as alleged in the FAC). After conducting such discovery, however, Plaintiff informed the court on April 5, 2017 that, for purposes of this action, he concedes that Tanouye was *not* on suicide watch at the time of the assault on Plaintiff. *See* ECF Nos. 35, 36. The parties agreed to submit the matter for decision without further supplemental briefing. ECF No. 35.

## III. <u>STANDARD OF REVIEW</u>

Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks proper subject matter jurisdiction. A Rule 12(b)(1) motion may be either facial

(attacking the sufficiency of the complaint's allegations to invoke federal

jurisdiction) or factual (disputing the truth of the allegations of the complaint).

*Safe Air for Everyone*, 373 F.3d at 1039.

In a facial attack, the court may dismiss a complaint when its

allegations are insufficient to confer subject matter jurisdiction, and a complaint's

factual allegations are taken as true and construed in the light most favorable to the

nonmoving party.  *Fed'n of African Am. Contractors v. City of Oakland,* 96 F.3d

1204, 1207 (9th Cir. 1996).  But in a factual attack "[w]here the jurisdictional issue

is separable from the merits of the case, the judge may consider the evidence

presented with respect to the jurisdictional issue and rule on that issue, resolving

factual disputes if necessary."  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs.*

*Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  In such case, "no presumptive

truthfulness attaches to plaintiff's allegations, and the existence of disputed

material facts will not preclude the trial court from evaluating for itself" the

existence of subject matter jurisdiction.  *Id.*

Further, where "the jurisdictional issue and substantive issues are so

intertwined that the question of jurisdiction is dependent on the resolution of

factual issues going to the merits, the jurisdictional determination should await a

determination of the relevant facts on either a motion going to the merits or at

trial."  *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).  That is, if

"the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment." *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) (quoting *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987)). "The Court 'must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact.'" *Id.* (quoting *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003) (en banc)); *see also Roberts v. Corrothers*, 812 F.2d 1173, 1777 (9th Cir. 1987) ("In such a case, the district court assumes the truth of allegations in a complaint . . . unless controverted by undisputed facts in the record.").

## IV.  DISCUSSION

### A.    The Discretionary Function Exception

The FTCA waives the sovereign immunity of the United States, permitting tort suits for damages against the government "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. It grants district courts with jurisdiction over civil actions for money damages for negligent or wrongful acts or omissions of government employees acting in the scope of employment "under circumstances where the United States,

if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

FTCA liability, however, is limited by exceptions set forth in 28 U.S.C. § 2680. At issue here is the "discretionary function" exception in § 2680, which provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to--
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *Gaubert*, 499 U.S. at 323. The government has the burden of proving applicability of the discretionary function exception. *See Meyers v. United States*, 652 F.3d 1021, 1028 (9th Cir. 2011) (citing *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002)). "Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged." *GATX/Airlog Co.*, 286 F.3d at 1174.

A two-part test applies to determine if the discretionary function exception bars an FTCA claim. "First, for the exception to apply, the challenged conduct must be discretionary -- that is, it must involve an element of judgment or choice." *Id.* at 1173. This inquiry "looks at the 'nature of the conduct, rather than the status of the actor' and the discretionary element is not met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Myers*, 652 F.3d at 1028 (quoting *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008)). If a "mandatory directive" is violated, this first requirement is not met -- the exception does not apply -- because "'the employee has no rightful option but to adhere to the directive.'" *GATX/Airlog Co.*, 286 F.3d at 1173-74 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). That is, "[i]f the employee violates [a] mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 324. "As the circuits have concluded, the reason for this rule is obvious -- a federal employee cannot be operating within his discretion if he is in fact violating a nondiscretionary policy." *Spotts v. United States*, 613 F.3d 559, 568 (5th Cir. 2010).

Second, if discretion is exercised, the court "determine[s] whether [the exercise of] judgment is of the kind that the discretionary function exception was designed to shield." *GATX/Airlog Co.*, 286 F.3d at 1174 (quoting *Berkovitz*, 486

U.S. at 536). "Only those exercises of judgment which involve considerations of social, economic, and political policy are excepted from the FTCA by the discretionary function doctrine." *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000) (citing *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). "The focus is on 'the nature of the actions taken and on whether they are susceptible to policy analysis.'" *GATX/Airlog Co.*, 286 F.3d at 1174 (quoting *Gaubert*, 499 U.S. at 325). The decision at issue "'need not *actually* be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.'" *Id.* (quoting *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000)). "When a statute, regulation or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993) (citing *Gaubert*, 499 U.S. at 324). "Even if the decision is an abuse of the discretion granted, the exception will apply." *Myers*, 652 F.3d at 1028 (quoting *Terbush*, 516 F.3d at 1129)).

**B.     Application of Discretionary Function Exception Standards**

        As explained earlier, the court previously determined that the FDC's *ultimate* decision of where to place Bishop was discretionary. ECF No. 23. The government thus argues that any alleged failure to complete underlying intake screening requirements that led to that discretionary placement decision are also

necessarily shielded from liability.  Mot. at 3, ECF No. 26-1 at 8.  Not so -- the court must address whether FDC personnel violated mandatory duties that then allowed them to exercise discretion.  *See, e.g.*, *Usry*, 2013 WL 1196650, at *7 ("*[S]o long as BOP personnel followed guidelines* in classifying inmates and placing them in certain institutions, the ultimate decision regarding an inmate's placement was discretionary.") (citation omitted).  As *In re Glacier Bay*, 71 F.3d 1447 (9th Cir. 1995), explains,

> the proper level of inquiry must be act by act. . . .  The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance.  Each separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield.

*Id.* at 1451.  And *Glacier Bay* "reject[ed] the district court's conclusion that the government cannot be liable for the final product of numerous specific actions, even if some of the actions were nondiscretionary and negligently executed, so long as others of those actions involved discretion."  *Id.*

Accordingly, the court proceeds to address separately the two types of mandatory policies alleged in the FAC -- policies relating to intake, and policies related to psychiatric screening and suicide prevention -- to determine whether the government has demonstrated that the discretionary function exception applies.

### 1. *Intake Screening Policies*

At step one of the analysis -- whether any relevant mandatory directives were violated -- the court first focuses on the inmate intake procedures in Statement P5290.15. In particular, P5290.15 (and 28 C.F.R. § 522.21(a) upon which it is based) states that "the Warden *shall* ensure that a newly arrived inmate is cleared by the Medical Department and provided a social interview by [FDC] staff *before* assignment to the general population." Statement P5290.15 ¶ 7a, ECF No. 29-2 at 3 (emphases added). Statement P5290.15 provides further that "before placing [an] inmate in the institution's general population, staff shall ensure that health, safety, and security standards delineated in this Program Statement are met." *Id.* ¶ 1, ECF No. 29-2 at 1. And it requires staff to "observe the physical appearance of the inmate and interview each inmate prior to placement in general population [and] [i]f this is not possible, inmates are to be kept in detention until completion of the medical clearance and social interview." *Id.* ¶ 7; ECF No. 29-2 at 2-3.

The Complaint alleges that FDC personnel did not properly screen Tanouye under this Program Statement. For example, the intake form leaves blank an answer to the question "is there a history of sexually aggressive behavior?," and likewise has nothing in the "comment" section to that question. Def.'s Ex. A, ECF No. 26-3. And to the question "if general physical appearance is not good,

explain," the interviewer simply wrote "New Commit." *Id.* There is nothing from either the interviewer, or on the intake form itself, indicating that any medical screening was performed. And indeed, the government proffers a December 12, 2016 Declaration from FDC Associate Warden David Bruce ("Bruce") recognizing that "[b]ecause Tanouye arrived at approximately 1:00 AM, a review by the Health Services Department was not immediately available." D. Bruce Decl. (Dec. 12, 2016) ¶ 13; ECF No. 26-2 at 5. The government thus acknowledges that a full medical clearance of Tanouye had not yet been performed before Tanouye was placed in a cell with Plaintiff.

But this does not matter -- the undisputed evidence in the record indicates that Tanouye was not placed in "general population" and the identified Statement P5290.15 only provides for certain mandatory duties "before placing [an] inmate in the institution's *general population.*" Statement P5290.15 ¶ 1, ECF No. 29-2 at 1 (emphasis added); *see also, e.g.*, *id.* ¶ 3 ("Social and medical screening interviews will be conducted on all inmates prior to their placement in general population.").

In this regard, Bruce attests that "Tanouye was not assigned to general population, but was assigned [with Plaintiff] to cell 132 in the Special Housing Unit, a two-person cell." D. Bruce Decl. (Dec. 12, 2016) ¶ 12, ECF No. 26-2 at 5. Bruce further explains that Special Housing Units ("SHUs") "are housing units in

BOP institutions where inmates are securely separated from the general inmate." *Id.* ¶ 13 (citing 28 C.F.R. § 541.21). "Inmates may be housed in SHU for disciplinary reasons or for administrative purposes [which] may include placement while pending custody classification, redesignation, or as a holdover prior to transfer to another facility." *Id.* (citing 28 C.F.R. §§ 541.22 to -.23).

The government also points out that placement of Tanouye in a SHU pending further examination is specifically permitted under Statement P5290.15, which states that "[i]f [an interview prior to placement in general population] is not possible, inmates are to be kept in detention until completion of the medical clearance and social interview." Statement P5290.15 ¶ 7a. Bruce attests that "[i]n [Statement P5290.15], the term 'detention' refers to administrative detention in the SHU." D. Bruce Decl. (Dec. 12, 2016) ¶ 14. Likewise, Bruce confirms that Plaintiff "had been previously assigned to the [SHU] on December 5, 2013, for unrelated administrative purposes, and was occupying cell 132 on October 12, 2014." *Id.* ¶ 15. That is, the FDC's actions were fully consistent with the Policy Statements, at least as to placing Tanouye in "detention" pending further examination.

In response, Plaintiff no longer contends, as alleged in the FAC, that Tanouye was placed in general population. Instead, he argues that "detention" must mean that an inmate who has not yet been fully screened must be kept

segregated from *any* other inmates.  Pl.'s Opp'n at 15, ECF No. 29 at 21.  Plaintiff

contends that Program Statements did not allow Tanouye to have been placed in a

SHU cell with Plaintiff, until further screening took place.  But this position

contradicts the plain language and meaning of the relevant regulations.  In

particular, 28 C.F.R. § 541.22 ("Status when placed in the SHU") provides in

relevant part:

> When placed in the SHU, you are either in administrative
> detention status or disciplinary segregation status.
>
> (a) Administrative detention status.  Administrative
> detention status is an administrative status which
> removes you from the general population when necessary
> to ensure the safety, security, and orderly operation of
> correctional facilities, or protect the public.
> Administrative detention status is non-punitive, and can
> occur for a variety of reasons.

Similarly, 28 C.F.R. § 541.23 ("Administrative detention status") provides in

relevant part:

> You may be placed in administrative detention status for
> the following reasons:
>
> (a) Pending Classification or Reclassification.  You are a new
> commitment pending classification or under review for
> Reclassification.

And 28 C.F.R. § 541.21 ("Special Housing Units") specifically allows inmates to

be housed with other inmates while in a SHU:

> Special Housing Units (SHUs) are housing units in
> Bureau institutions where inmates are securely separated
> from the general inmate population, and *may be housed
> either alone or with other inmates*. Special housing units
> help ensure the safety, security, and orderly operation of
> correctional facilities, and protect the public, by
> providing alternative housing assignments for inmates
> removed from the general population.

(Emphasis added).

Accordingly, given the undisputed record -- and even assuming that FDC personnel failed to fulfill required duties before it could place Tanouye in general population -- Plaintiff's claim based on Statement P5290.15 is barred. That is, the FAC fails to allege a breach of a relevant non-discretionary duty in Statement P5290.15 that could have led to Plaintiff's injuries. Regardless of the screening process, the FDC had discretion to place Tanouye in administrative detention in the SHU with Plaintiff. That is, Plaintiff's claim fails at step one of the analysis. *See, e.g.*, *GATX/Airlog Co.*, 286 F.3d at 1173 ("First, for the exception to apply, the challenged conduct must be discretionary -- that is, it must involve an element of judgment or choice.").[5]

_____

[5] Stated differently, because Tanouye was not placed in general population, even assuming FDC personnel negligently failed to complete intake duties in Statement P5290.15, such a violation could not have proximately or legally caused injury to Plaintiff. *See In re Glacier Bay*, 71 F.3d at 1451 ("It remains possible that because NOAA supervisors ultimately approved the surveys in question, [plaintiff] may not be able to show any alleged hydrographer errors actually caused them injury. That issue, however, is one of proximate cause.").

At the second step of the analysis, it is equally clear that such

placement decisions involve policy considerations.  *See Cohen*, 151 F.3d at 1344

("Deciding how to classify prisoners and choosing the [location] in which to place

them are part and parcel of the inherently policy-laden endeavor of maintaining

order and preserving security within our nation's prisons."); *cf. Brown v. United

States*, 569 F. Supp. 2d 596, 600 (W.D. Va. 2008) ("Because 28 C.F.R. § 522.21

implicitly confers discretion on prison officials in deciding whether to place an

inmate in the general population, it is presumed that such decision is grounded in

policy.").  Whether or not the FDC was careless in making its housing decision in

placing Tanouye in the SHU with another inmate, it conformed to applicable BOP

Program Statements.  As the First Circuit reasoned:

> In many, if not most, instances where an inmate is
> unfortunately injured by another inmate, it will be
> possible to argue that a different exercise of discretion or
> a different policy choice might well have forestalled the
> injury.  Nevertheless, decisions with regard to
> classification of prisoners, assignment to particular
> institutions or units, and allocation of guards and other
> correctional staff must be viewed as falling within the
> discretionary function exception to the FTCA, if penal
> institutions are to have the flexibility to operate.

*Santana-Rosa*, 335 F.3d at 44.

///

///

## 2. *Psychiatric and Suicide-Prevention Regulations*

The court next addresses Statements P6340.04 and P5324.08, which concern psychiatric services and suicide prevention. In particular, Plaintiff focuses alleged violations of paragraph nine of Statement P6340.04, which states:

> 9. **EVALUATIONS.** The Medical Director will provide guidance for standards and formats for psychiatric evaluations.
>
> a. **Intake Screening.** Staff performing intake screening will assess and make appropriate referrals to a mental health professional when an inmate:
>
> - Has a mental health designation;
> - Exhibits signs or symptoms consistent with a possible mental disorder; or
> - Is on medication for treatment of a mental illness or disorder
>
> Screening will be of sufficient detail to determine appropriate housing for the inmate until a thorough mental health evaluation can be completed.

ECF No. 26-5 at 8. Plaintiff contends that the FDC failed to meet this "mandatory" requirement because Tanouye's screening (where he exhibited obvious signs of a mental disorder) was of insufficient detail to determine appropriate housing before conducting a full mental evaluation. Pl.'s Opp'n at 18, ECF No. 29 at 24. The court disagrees.

To start, this provision is but one part of a comprehensive, sixteen-page Program Statement encompassing many different aspects of inmate

psychiatric services "throughout the inmates' incarceration." Statement P6340.04 ¶ 1, ECF No. 26-5 at 2. The Program Statement is meant broadly to "address the physical, medical, psychological, social, vocational and rehabilitative needs of inmates in the [BOPs] custody who suffer from mental illnesses and disorders." *Id.* This Statement's specific intake screening provision in paragraph nine does not mention *when* such screening must be accomplished, nor address any other aspect of an inmate's housing.

Rather, timing of screening and housing decisions are specifically detailed in other Program Statements. For example, under Statement P5290.15, medical screening is supposed to occur "*[w]ithin 24 hours after an inmate's arrival.*" Statement P5290.15 at 3 (emphasis added). In like manner, "[i]f this is not possible, inmates are to be kept in detention until completion of the medical clearance and social interview." *Id.* And similarly, under Statement P5324.08, "[m]edical staff are to screen a newly admitted inmate for signs that the inmate is at risk for suicide. Ordinarily, this screening is to take place *within twenty-four hours of an inmate's admission* to the institution." Statement P5324.08 ¶ 9a., ECF No. 26-6 at 6 (emphasis added). Reading these Program Statements together, there could have been no violation of P6340.04's screening provision -- Tanouye had only been at the FDC for a few hours (well within a 24-hour requirement) when he allegedly assaulted Plaintiff.

In any event, Statement P6340.04 ¶ 9a cannot form the basis of a non-discretionary duty for purposes of the FTCA -- it contains inherently discretionary language, such as "Staff performing intake screening will . . . make *appropriate* referrals," and "[s]creening will be of *sufficient* detail to determine *appropriate* housing." *Id.* (emphases added). Such terms indicate discretion, leaving ample room for an exercise of judgment or choice. *See Berkovitz*, 456 U.S. at 546-47 ("[I]f the [agency's] policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful."); *In re Glacier Bay*, 71 F.3d at 1454 (concluding that a regulation requiring surveys that are "adequate" or "substandard in any way" "leaves an element of judgment or choice," and thus involve discretion protected by the discretionary function exception); *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993) (reiterating that only if a statute or regulation embodies a "'fixed or readily ascertainable standard,' will a government employee's conduct not fall within the discretionary function exception") (quoting *Miller v. United States*, 710 F.2d 656, 663 (10th Cir. 1983)); *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 396-97 (6th Cir. 2004) (applying the discretionary function exception where "the relevant statute and regulations allowed BOP officials to exercise judgment when making decisions regarding [an

inmate's] safety," reasoning in part that "the [regulatory] phrases 'at such times' and 'to the degree necessary' clearly allow prison officials discretion").

Further, Bruce attests that such a decision is discretionary and involves policy-related judgment:

> The decision as to whether an inmate is appropriate for a referral to a mental health professional is made at the discretion of the staff conducting the intake screening process, and there is no mandatory policy, regulation, or law which requires that the staff refer the inmate to a mental health professional based on the information obtained during the intake process. This decision [is] made based upon multiple public policy factors including the staff and resources available, the inmate's conduct and demeanor at the time of the intake screening process, and sound correctional [judgment].

D. Bruce Decl. (Dec. 12, 2016) ¶ 20, ECF No. 26-2 at 8. And Plaintiff offers no evidence to the contrary.

Lastly, Plaintiff contends that the BOP's suicide-prevention Policy Statement required Tanouye to have been placed in a segregated suicide prevention room, away from any other inmates. *See* Statement P5324.089 ¶ 11b ("If the Program Coordinator determines the individual to have an imminent potential for suicide, the inmate will be placed on suicide watch in the institution's designated suicide prevention room.") *and* ¶ 12a ("Inmates on watch will be placed in the institution's designated suicide prevention room, a non-administrative detention/segregation cell ordinarily located in the health services area.").

But the government's uncontested evidence is that Tanouye was not on suicide watch, and thus these Policy Statements do not apply. Bruce attests:

> From the time that Tanouye arrived at FDC Honolulu at approximately 1:00 AM until the time that the alleged assault happened at 6:20 am, Tanouye had not been reviewed by the Program Coordinator of FDC Honolulu's Suicide Prevention Program and had not been placed on suicide watch.

D. Bruce Decl. (Dec. 12, 2016) ¶ 19, ECF No. 26-2 at 7.[6]

It's true that the FAC *alleges* that "[Plaintiff] was told to watch [Tanouye] as the prisoner was on suicide watch." FAC ¶ 11. But, as explained earlier, at the February 17, 2017 hearing, the court gave Plaintiff leave to conduct discovery into whether Tanouye was actually on suicide watch (i.e., to attempt to dispute Bruce's Declaration). ECF No. 31. Plaintiff conducted such discovery, and states that, "based on the facts known to Plaintiff, Plaintiff now concedes that Mr. Tanouye was not on suicide watch at the time of the assault on Plaintiff." ECF No. 36. *See Thornhill Publ'g Co., Inc.*, 594 F.2d at 733 (explaining that, in a

---

[6] Statement 5324.08 allows suicide screening to be conducted "within twenty-four hours of the inmate's admission." The Statement provides:

> 9. **IDENTIFICATION OF AT-RISK INMATES.**
>
> a. **Medical Staff Screening.** Medical staff are to screen a newly admitted inmate for signs that the inmate is at risk for suicide. Ordinarily, this screening is to take place within twenty-four hours of the inmate's admission to the institution.

Statement P5324.08 ¶9, ECF No. 29-4 at 5.

factual attack on jurisdiction under Rule 12(b)(1), "no presumptive truthfulness attaches to plaintiff's allegations); *Autery*, 424 F.3d at 956 (reiterating that, where the merits are intertwined with the jurisdictional issue under the FTCA, the court "must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact") (citation and internal quotation marks omitted).

In short, mandatory suicide-prevention Policy Statements do not apply. The FDC had discretion to place Tanouye in Plaintiff's cell in the SHU. The government has met its burden to demonstrate that the discretionary function exception to the FTCA bars claims alleging violations of Policy Statement P6340.04.[7]

## V. CONCLUSION

The court recognizes that its conclusion is harsh. No one disputes that Tanouye seriously injured Plaintiff. Nor is there serious dispute that Tanouye exhibited signs of a psychiatric condition and placing him in the same cell as Bishop was likely negligent. But the FDC has considerable discretion in its placement decisions such that, negligent or not, the discretionary function exemption bars this suit regardless of whether the FDC's placement decision was

---

[7] Because the claim is barred, the court need not reach the government's alternate argument that any injury to Plaintiff was not the foreseeable result of suicide-prevention Policy Statements, which are meant to protect a suicidal inmate and not to protect other inmates.

negligent, and regardless of whether the FDC ought to re-examine the procedures that allowed that decision. *See, e.g.*, *Myers*, 652 F.3d at 1028 ("Even if the decision is an abuse of the discretion granted, the exception will apply.") (quoting *Terbush*, 516 F.3d at 1129).

Accordingly, Defendant's Motion to Dismiss is GRANTED. Because Plaintiff has already had an opportunity to amend his Complaint, and further amendment would be futile, the dismissal is with prejudice. The Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 13, 2017.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Bishop v. United States of America*, Civ. No. 16-00248 JMS-KSC, Order Granting Defendant's Motion to Dismiss, ECF No. 26